Filed 10/24/23  P. v. Rickleffs CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES RICKLEFFS,<br><br>    Defendant and Appellant. | A163456<br><br>(San Francisco County<br>Super. Ct. No. SCN222057) |

James Rickleffs (appellant) appeals his convictions, following a jury trial, for murder, robbery, burglary, and theft.  We reverse and remand the convictions for robbery and for murder, and otherwise affirm.

BACKGROUND

*Information*

The operative amended information charged appellant with the murder of Steven Eric Escalon (Pen. Code, § 187, subd. (a)),[1] first degree robbery of Escalon (§ 211), first degree burglary of Escalon's bedroom (§ 459), and first degree burglary of the bedroom of Escalon's roommate, Ryan Hohn (*ibid.*).

---

[1] All undesignated section references are to the Penal Code.

1

The information also alleged multiple prior strikes (§ 667, subds. (d) & (e); § 1170.12, subds. (b) & (c)) and prior prison terms (§ 667.5, subd. (b)).

*Eyewitnesses*

On June 11, 2012, Escalon and a friend had drinks at Escalon's apartment before going out to bars in the Castro neighborhood of San Francisco. Escalon's friend eventually lost track of Escalon.

About 1:30 a.m., a cab driver picked up appellant and another man outside a bar in the Castro. While the cab driver drove to a residential address in the Diamond Heights neighborhood, the two men argued because appellant wanted to stop and pick up drugs, but the other man refused. The two men also discussed appellant providing a sexual service to the other man. The driver dropped them off outside Escalon's apartment. After the men left the cab, the driver noticed a foldable knife on the back seat, which appellant returned to retrieve.

About 3:00 a.m., Ryan Hohn, one of Escalon's roommates, got up to use the bathroom, saw a light on in Escalon's bedroom, and heard someone talking in a whisper. Hohn woke up at 6:00 a.m. and left for work at 7:30 a.m. During that time, he did not see Escalon or hear anything from Escalon's bedroom.

When Hohn returned home from work about 5:30 p.m., the door to their apartment was slightly ajar, and Hohn's TV and video game system were missing from the living room. Hohn's computer, social security card, and other items were missing from his room. Hohn went into Escalon's room and saw him lying on his bed covered by a duvet. Hohn moved the duvet, saw that Escalon's face was blue, and called the police.

*Crime Scene*

The first responding officer found Escalon blindfolded with a blanket wound around his body and a cloth tightly wrapped around his head and in his mouth. Duct tape covered the cloth in his mouth, and his hands and feet were bound with duct tape. Underneath the blanket he was dressed. His skin was warm but he was not breathing and had no pulse. Paramedics arrived soon after but were unable to revive him.

Sergeant Scott Warnke and Inspector Kevin Jones responded to Escalon's apartment that evening. Jones noticed an overwhelming smell of amyl nitrate coming from a scarf wrapped around Escalon's neck. Amyl nitrate, also known as " 'poppers,' " is sold over the counter for other uses, but when inhaled provides "a head rush." An uncapped bottle with the same shape as bottles that contain amyl nitrate was tipped over on a table next to the bed. Warnke did not initially smell amyl nitrate, but when the medical examiner rolled Escalon onto his side, Warnke smelled its odor emanating from a scarf underneath Escalon's body. The medical examiner, Ellen Moffatt, also smelled amyl nitrate when she approached Escalon's body. Moffatt testified the scarf was moist at the scene and dry by the time it was taken back to the medical examiner's office.

*Forensic Evidence*

A knife Hohn found in his closet about a week after Escalon's death had DNA consistent with Hohn and appellant as possible contributors.

The medical examiner, Moffatt, performed an autopsy on Escalon. There was foam in his trachea, indicating he was not breathing normally before he died. He had abrasions on his wrists consistent with being bound

3

by zip ties.[2]  The abrasions could have been caused by Escalon struggling against the bindings or could have been caused because the bindings were tight.  The autopsy photographs showed bruising on his lips, although Moffatt did not note the bruising in her autopsy report.[3]  Moffatt found no other trauma or injuries.  She found no evidence of sperm.

A toxicology report analyzed blood drawn by Moffatt.  Luke Rodda, the medical examiner's office's chief forensic toxicologist at the time of trial, testified as an expert in forensics toxicology and the effects of amyl nitrate and gamma hydroxybutyrate, also known as GHB.[4]  He reviewed the toxicology report, which showed Escalon had elevated levels of GHB and nitrates.  Because amyl nitrate rapidly converts to nitrates inside the body, toxicology testing is for nitrates rather than amyl nitrate.  Nitrates naturally appear in the body at levels between 0.5 and 5 milligrams per liter, and Escalon had 37 milligrams per liter.  GHB naturally appears in the body at levels up to 5 milligrams per liter, and Escalon had 14 milligrams per liter.  These figures do not indicate the levels at the time of Escalon's death, because both GHB and nitrates redistribute in the body after death.

If a living person had the level of GHB indicated in Escalon's toxicology report, the person would still be awake and might not exhibit any effects.  If a living person had the level of nitrates indicated in Escalon's toxicology report,

---

[2] When Moffatt arrived at the crime scene, she saw zip ties on the floor close to Escalon's body.

[3] A defense expert in forensic pathology testified Escalon's lips were not bruised, but rather showed signs of postmortem changes.  The defense expert also testified standard forensic practice is to document any bruising in the autopsy report.

[4] Rodda and other witnesses testified GHB is a recreational drug that is usually found as a liquid and ingested by drinking it.

the person would likely be feeling light-headed and have decreased motor functioning.  Although it is not known at what levels GHB or nitrates are lethal, at a certain point either can lead to sedation, coma, and death.  Rodda opined that having a scarf with amyl nitrate over one's mouth for a prolonged period of time could have such effects.

Moffatt, the medical examiner, reached her conclusions about cause of death after considering the toxicology report, the crime scene, and the autopsy.  She concluded Escalon's death was caused by GHB and nitrate intoxication, with possible asphyxia from the cloth in his mouth.

*Appellant's Possession of Stolen Items and Police Interview*

On the afternoon of June 13, 2012, the day after Escalon died, police apprehended appellant for an unrelated incident.  Appellant was carrying a suitcase that was booked into property control at the police station.  On August 31, after appellant became a suspect in Escalon's murder, police reviewed the contents of the suitcase and found, among other items, Escalon's checkbook and Hohn's ATM card.

On September 2, 2012, police interviewed appellant.  The entire interview lasted almost six hours.  Approximately two and one-half hours of the interview was played for the jury, and a transcript was provided.

Initially, appellant told police he got the suitcase containing the stolen items from a drug dealer, had never been to Diamond Heights, and was not in the Castro on the night of June 11.  Police then told appellant his DNA was found on a knife in the Diamond Heights apartment where the property had been stolen, a cab driver identified appellant as a man the driver had picked up in the Castro and dropped off at the Diamond Heights apartment, and the theft victim had died.  Appellant then told police he met Escalon at a Castro bar and Escalon offered to pay appellant to take nude photographs of

him.  Initially Escalon offered three or four hundred dollars, but in the cab he said two hundred.  Then, after Escalon took the photographs, he gave appellant a hundred dollars.  Escalon made other sexual demands which appellant refused.  Appellant took a shower but, when he got dressed, the money Escalon had given him was missing from his pants pocket.

Escalon and appellant were both drinking, and Escalon was sniffing a substance that "[g]ives you a headrush."  Appellant thought Escalon had done something like ecstasy because he kept mentioning it, and Escalon also said he wanted to do some "G."[5]  Escalon wanted appellant to tie Escalon up and appellant did so.  Escalon complained appellant was being too " 'nice' " and wanted appellant to be " 'rough.' "  Then Escalon asked appellant to gag him with a rag that had been used to wipe up spilled poppers; appellant also said after Escalon was bound and gagged he leaned over the table where poppers had spilled to sniff more.  Appellant threw a blanket or a bathrobe over Escalon.

Because Escalon had taken back the money he had given appellant, appellant took Escalon's computer and phone.  He went into Escalon's roommate's room but denied taking anything from that room.  When appellant left, Escalon was still alive; he had had the gag on for about 15 minutes and appellant heard him breathing or snoring.

*Defense Evidence*

An expert in forensic toxicology testified for the defense.  The expert testified that if a person takes a fatal amount of amyl nitrite, a chemical change occurs that turns their blood chocolate brown.  The blood will remain chocolate brown after death despite being exposed to oxygen.  Because the

---

[5] During closing argument, defense counsel construed this as referring to GHB.

blood drawn from Escalon was not brown, despite having an elevated nitrate level, the death was not caused by an overdose of amyl nitrite. Vomiting is another sign of excessive amyl nitrate consumption; therefore, a death with no indication of vomiting is inconsistent with amyl nitrate overdose. GHB can cause coma and death. Mixing GHB and alcohol will cause GHB levels to go up. GHB levels in postmortem blood samples decrease over time, and the level of GHB found in Escalon's blood tested months after death is consistent with death caused by a GHB overdose.

The defense presented redacted online communications made by Escalon. One referred to "poppers," and another stated, "I'll be blindfolded" and "I have porn and poppers ready."

*Verdict, New Trial Motion, and Sentence*

The jury found appellant guilty of first degree murder; guilty of first degree robbery of Escalon; not guilty of first degree burglary of Escalon's bedroom, but guilty of the lesser included offense of petty theft (§ 484); and guilty of first degree burglary of Hohn's bedroom. In a bifurcated proceeding, the court found true prior conviction and prior prison term allegations.

After the verdict, appellant retained new counsel and filed a motion for a new trial. The court denied the motion and sentenced appellant to 50 years to life in state prison.

DISCUSSION

I.   *Murder Conviction*

   A.   *Murder By Poison Instructional Error*

The jury was instructed on two alternative theories of first degree murder: murder by poison and felony murder. Appellant argues the jury instructions for the murder by poison theory were erroneous.

7

After appellant's convictions, the California Supreme Court held in *People v. Brown* (2023) 14 Cal.5th 453 (*Brown*) that "to prove first degree murder by means of poison, the prosecution must show the defendant deliberately gave the victim poison with the intent to kill the victim or inflict injury likely to cause death." (*Id.* at p. 457.) Because the jury was instructed the defendant was guilty of first degree murder if she " 'murdered by using poison,' " and was "not instruct[ed] . . . that it needed to find that [the defendant] had any particular, heightened mental state in giving the poison to the victim to find her guilty of murder in the first degree rather than in the second degree," the instructions were federal constitutional error. (*Id.* at pp. 460, 472–473.)

The People properly concede that the erroneous instructions given in *Brown* were also given in this case. The People also properly concede the error was not harmless beyond a reasonable doubt as to the murder by poison theory and requires reversal of the first degree murder conviction. (*In re Lopez* (2023) 14 Cal.5th 562, 580 ["Where a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred. . . . The error therefore requires reversal unless we determine the error was harmless beyond a reasonable doubt."].)

B.     *Laboratory Test Results*

Appellant raises another challenge to the murder conviction: the admission of the laboratory report showing the levels of nitrates and GHB in Escalon's system, and testimony about the report. We agree this evidence was inadmissible hearsay and find the error prejudicial as to appellant's

8

murder conviction, requiring a reduction to involuntary manslaughter unless the People elect to retry the murder charge.[6]

### 1. *Additional Background*

The only evidence of the levels of nitrate and GHB in Escalon's system came from a report created by a Pennsylvania laboratory, NMS Labs, which processed samples provided by the medical examiner's office. The NMS Labs report did not include any raw data, but just listed the results of the testing performed. Rodda, the prosecution's toxicology expert, could not independently reach a conclusion about the levels of nitrate and GHB, but instead relied solely on the levels identified in the NMS Labs report.

No one from NMS Labs testified at trial; instead, Rodda testified about the NMS Labs report. The NMS Labs report was also admitted into evidence. Defense counsel objected to both Rodda's testimony about the report and the admission of the report.

### 2. *Hearsay*

"[A]n expert may not relate inadmissible '*case-specific* facts about which the expert has no independent knowledge.' [Citation.] 'Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried.' [Citation.] Testimony relating such facts, unlike testimony about non-case-specific background information, is subject to exclusion on hearsay grounds." (*People v. Veamatahau* (2020) 9 Cal.5th 16, 26 [quoting *People v. Sanchez* (2016) 63 Cal.4th 665, 676].) The NMS Labs report contained case-specific facts about which Rodda had no personal knowledge. The People do not contend otherwise. Thus, the admission of the report and Rodda's testimony about its contents was state-

---

[6] Appellant also challenges the evidence as violating the confrontation clause. We need not and do not decide this issue.

law error. (See *People v. Valencia* (2021) 11 Cal.5th 818, 840 (*Valencia*) [" 'improper admission of hearsay may constitute state law statutory error' "].)

Appellant argues he was prejudiced by the error. We have already concluded the first degree murder conviction must be reversed for instructional error. At oral argument, appellant's counsel conceded we could allow the People to accept a reduction to involuntary manslaughter on remand. Accordingly, we focus our prejudice analysis on whether it is reasonably probable that, without the erroneously admitted evidence, the jury would have found appellant guilty of involuntary manslaughter rather than second degree murder. " ' "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." ' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

The jury was instructed that to find appellant guilty of implied malice second degree murder,[7] it must find appellant intentionally committed an act that caused Escalon's death, the natural and probable consequences of the act were dangerous to human life, appellant knew the act was dangerous to human life, and appellant deliberately acted with conscious disregard for human life. (See CALCRIM No. 520.) "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989.)

As to involuntary manslaughter, the jury was instructed, "The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her

---

[7] The prosecutor relied exclusively on implied malice, arguing to the jury, "Malice aforethought, in this case, it's implied malice."

10

actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter." (See CALCRIM No. 580.) Thus, the jury was instructed that, to find appellant guilty of involuntary manslaughter, it must find appellant acted "in a reckless way that creates a high risk of death or great bodily injury" and "A reasonable person would have known that acting in that way would create such a risk."

The prosecutor argued evidence of conscious disregard included appellant's acts of binding Escalon, gagging him, covering him with a blanket, and leaving him alone. The prosecutor also argued conscious disregard was demonstrated because appellant "knew he had amyl nitrate on that rag" he put in Escalon's mouth, and appellant "knew what he was doing was dangerous. He had taken some of the poppers and the amyl nitrate himself, and he knew it was dangerous, but he didn't do anything." During argument, the prosecutor referenced the levels of nitrate found in Escalon's body: "There's bottles at the -- in the bedroom, there's the smell that witnesses who had experience with poppers recognized, and there is a *presence of nitrate in the decedent's blood*. So that there was exposure to poppers, that's a fact that's been proved beyond a reasonable doubt" (italics added), and "the *level of amyl nitrate* and the suffering that [Escalon] was going through, is evidence that this was against his will" (italics added).

In other words, one of the prosecutor's arguments was that Escalon's consumption of a substantial amount of amyl nitrate created a high risk of

11

death if Escalon were unable to seek help, and appellant consciously disregarded that risk. To be sure, as the People note, there was admissible evidence that Escalon ingested amyl nitrate before his death: law enforcement officers and the medical examiner responding to the scene smelled amyl nitrate coming from Escalon and/or a scarf that had been wrapped around his mouth; an empty amyl nitrate bottle was found on a table next to Escalon's bed; and appellant told police Escalon had been inhaling "poppers." But this evidence does not indicate the *quantity* of nitrates he consumed, which the People's experts testified was significant to the level of risk. Moffatt, the medical examiner, testified Escalon had a "fatal amount of amyl nitrate and GHB in his system," and he possibly could have died from the "levels of nitrates and GHB alone," even absent any asphyxiation. Rodda testified about the effects the levels of nitrates found in the NMS Labs report would have on a living person. The NMS Labs report and attendant testimony was the *only* evidence about the levels of nitrates in Escalon's system.[8]

We conclude there is a reasonable probability the jury would not have found appellant acted with conscious disregard if the inadmissible evidence

---

[8] The People argue Rodda and Moffatt could have testified that they reviewed a toxicology report and relied on it to reach their expert opinions, without discussing the evidence contained in the NMS Labs report or admitting the report itself. We need not decide whether such opinion testimony would be admissible. (*People v. Moore* (2011) 51 Cal.4th 386, 406 ["[P]roposed expert testimony [that] rests on an assumption without any support in the trial evidence, . . . has little or no probative value, bears the potential to mislead the jury into accepting the unsupported assumption and drawing from it unwarranted conclusions, and thus cannot significantly 'help the trier of fact evaluate the issues it must decide.'"].) It is sufficient for our purposes that the expert opinions would carry substantially less weight with the jury absent the supporting toxicology report.

had been excluded. Specifically, absent evidence from the NMS Labs report that Escalon consumed a significant amount of drugs, there is a reasonable probability the jury would have found appellant's acts of binding, gagging, and leaving Escalon did not demonstrate conscious disregard, but rather only satisfied the lower standard for involuntary manslaughter. Accordingly, on remand, the People may elect to accept a reduction to involuntary manslaughter, or to retry the murder charge.[9]

Appellant argues the error was also prejudicial as to the robbery conviction. We need not decide this issue because we are reversing the robbery conviction on other grounds (*post,* part II). Appellant does not contend the error was prejudicial as to the burglary or theft counts.

II.    *Force Instruction*

Appellant argues instructional error on the robbery charge. The jury was instructed that an element of robbery is "The defendant used force or fear to take the property or to prevent the person from resisting." (CALCRIM No. 1600.) Appellant argues this instruction was erroneous in the context of this case because it allowed the jury to conclude the requisite force could be consensual.[10]

---

[9] We need not decide appellant's separate challenge that the felony murder theory was legally invalid because of erroneous jury instructions. We also need not decide appellant's challenge relating to evidence of misconduct by a medical examiner's office employee, which appellant argues was material only as to the murder-by-poison theory of first degree murder.

[10] Although appellant did not object to the instruction below, the People do not contend the claim is forfeited. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review."].) As appellant notes, even if the contention were forfeited, it would be reviewable pursuant to an ineffective assistance of counsel claim.

The parties dispute whether the force required for robbery must be nonconsensual.  Appellant relies on *People v. Kelley* (1990) 220 Cal.App.3d 1358 (*Kelley*)*,* where the defendant told a witness he and a coconspirator planned to play a drinking game with the victim, get the victim drunk, and then take his money.  (*Id.* at pp. 1363–1364.)  The victim was subsequently found dead from blunt trauma.  (*Id.* at p. 1364.)  Evidence at the scene indicated a drinking game had been played; the victim's blood-alcohol level was .21 percent; and the victim's wallet was lying on the floor, empty.  (*Ibid.*)  The defendant was convicted of conspiracy to commit robbery and murder.  (*Id.* at p. 1363.)

The Court of Appeal held, "Since the facts here could support a finding [the defendant and his coconspirator's] plan was to get [the victim] so drunk that he would pass out and thus they would not need to use any force or fear to take [the victim's] money and that a charged overt act occurred making a culpable conspiracy complete, the jury should have been instructed on conspiracy to commit theft as a lesser included offense of conspiracy to commit robbery."  (*Kelley, supra,* 220 Cal.App.3d at p. 1369; see also *id.* at p. 1366 ["Theft is a lesser included offense of robbery since theft does not require the use of force or fear in the taking."].)  The court contrasted cases finding force when "the defendant administered a drug to an unsuspecting victim and the victim was involuntarily intoxicated."  (*Id.* at p. 1368.)  The court reasoned, "In cases where the victim's lack of resistance or unconsciousness is not due to the defendant surreptitiously drugging the victim, but due to the victim's own actions, the legal authorities and courts of

this and other states have found the force element lacking when the defendant takes property from an unconscious victim." (*Id.* at p. 1368.)[11]

The People argue any consent to the use of force is irrelevant to whether a robbery has occurred; the only act that must be against the victim's will is the taking. The People argue *Kelley* is distinguishable because *no* force was used in that case. *Kelley* would only apply, the People argue, "if Escalon had tied himself up and thereby rendered himself unable to resist the taking of his property."[12]

We disagree. *Kelley* focused on whether the victim knowingly and willingly rendered himself incapacitated. This reasoning applies here: whether Escalon tied himself up, as in the People's example, or whether appellant tied him up at his request, Escalon would have knowingly and willingly taken action to render himself unable to resist. In either instance, his resistance would not have been overcome " '*without the voluntary co-operation* of the subject whose resistance is repressed.' " (*Kelley, supra,* 220 Cal.App.3d at p. 1368; see also *People v. Dreas* (1984) 153 Cal.App.3d 623, 628 [" ' "Force" is the power or energy by which resistance is overcome.' "].) We thus agree with appellant that the force required for a

---

[11] Appellant argues *Kelly*'s holding was incorporated into CALCRIM No. 1600, which includes the following bracketed language: "An act is done *against a person's will* if that person does not consent to the act." This language appears to relate to the taking element, which requires a finding that "The property was taken *against that person's will.*" (CALCRIM No. 1600, italics added.)

[12] At trial, the prosecutor argued appellant "drugg[ed]" Escalon and bound him, both of which could constitute the requisite force. The People apparently do not dispute that if Escalon voluntarily ingested amyl nitrate, the force element would not be satisfied.

robbery must be nonconsensual and the court erred in failing to so instruct the jury.

"[A] trial court's failure to instruct on an element of a crime is federal constitutional error that requires reversal of the conviction unless it can be shown beyond a reasonable doubt that the error did not contribute to the jury's verdict." (*People v. Cole* (2004) 33 Cal.4th 1158, 1208.) Contrary to the People's argument, the evidence did not overwhelmingly demonstrate Escalon resisted being bound.[13] The medical examiner testified the abrasions on his wrists could indicate a struggle, but were also consistent with lack of struggle; she further testified that she did not conclude the lip bruising was a sign of struggle. There were no other signs of struggle or defensive injuries. Appellant consistently told the police Escalon asked to be tied up. In addition, the prosecutor argued the jury could convict appellant of robbery even if it found Escalon consented to being bound: "Why did [appellant] tie up Eric Escalon? Because Eric Escalon consented; does that matter? Does the intent of the victim matter for robbery? [¶] No. The defendant's intent matters. His intent to steal, the fact that he's using that word to steal, that's

_____

[13] That "[t]here was also overwhelming evidence that Escalon did not want appellant to take his property," as the People argue, is immaterial to whether the use of force was consensual.

what matters. He's guilty of that robbery."[14] We have little difficulty finding appellant prejudiced by the instructional error.[15]

Accordingly, we will reverse and remand the robbery conviction. On remand, the People may elect to accept a reduction of the conviction to petty theft or to retry the robbery charge.[16]

III.    Miranda v. Arizona (*1966) 384 U.S. 436*

Appellant argues his September 2, 2012 statement to police was obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and that the trial court erred in denying appellant's motion to exclude the statement.[17] We disagree.

---

[14] The People do not argue the murder conviction establishes the jury necessarily found Escalon resisted being bound. We agree with the implied concession. As with the robbery charge, the prosecutor argued the jury could convict appellant of murder even if Escalon consented to being bound: "You believe there was consent for being tied up? Is there any evidence of consent to being left that way? Is there any evidence of consent to dying? To being found that way? No. And those actions by [appellant], that's what caused Eric Escalon to die. Leaving Eric Escalon helpless, it caused Eric Escalon to die." Accordingly, the jury could have convicted appellant of murder without finding Escalon resisted the binding.

[15] Appellant also argues the prosecutor's argument constituted prosecutorial misconduct and the trial court failed to adequately respond to a jury question about force. We need not and do not decide these issues. We also need not decide whether the error was prejudicial as to the murder conviction, because we are reversing that conviction on other grounds.

[16] Appellant's contention there was insufficient evidence Escalon resisted the binding is unavailing. Sufficient evidence was present, including the wrist abrasions and the extent of the binding, which the prosecution argued alone indicated it was not consensual.

[17] Although we are reversing the murder and robbery convictions, this claim remains relevant as to appellant's burglary and theft convictions, as

17

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' [Citations.] If the suspect knowingly and intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' " (*People v. Martinez* (2010) 47 Cal.4th 911, 947 (*Martinez*).) " 'On appeal, we review independently the trial court's legal determinations of whether a defendant's . . . *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his right to silence [citation]. We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and " 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.' " ' " (*People v. Krebs* (2019) 8 Cal.5th 265, 299 (*Krebs*).)

A.      *Prior Invocation of Right to Remain Silent*

At an evidentiary hearing on appellant's motion to exclude his statement to police, Inspector Warnke testified that he understood appellant was arrested on August 31, 2012 for an unrelated theft offense. The officer who interviewed appellant on August 31 told Warnke that appellant said he

_____

well as to a reduction of the murder conviction to involuntary manslaughter that the People may choose to accept on remand.

18

did not want to talk to police, but did not ask for an attorney.[18]  On September 2, Warnke was present when another officer read appellant his *Miranda* rights.  Appellant acknowledged he understood his rights and proceeded to answer questions from Warnke and the other officer.

"In *Michigan v. Mosley* (1975) 423 U.S. 96, 104 [46 L.Ed.2d 313, 96 S.Ct. 321] (*Mosley*), the high court held 'the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored." ' " (*Krebs, supra,* 8 Cal.5th at p. 314.)  "In *Mosley*, despite the defendant's invocation of the right to remain silent, the high court declined to find a *Miranda* violation because 'the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.' [Citation.]  In *Mosley*, the time elapsed between the invocation of the right to silence and the reinterrogation was 'more than two hours.' " (*Martinez, supra,* 47 Cal.4th at p. 950.)  "[A]s *Mosley* made clear, a suspect's decision to cut off questioning, unlike his request for counsel, does not raise the presumption that he is unable to proceed without a lawyer's advice." (*Arizona v. Roberson* (1988) 486 U.S. 675, 683.)

The parties dispute whether appellant was arrested on August 31 only for an unrelated offense or also for the Escalon homicide.[19]  But the pertinent

---

[18] This officer did not testify because of a health issue.  Although appellant initially objected to the hearsay statements, defense counsel subsequently questioned Warnke about them with no prosecution objection and the trial court ruled they were therefore admitted for the truth.

[19] At the evidentiary hearing, appellant presented the August 31 police "booking card" which listed murder as the last of four charges.

issue is not whether he was arrested for the homicide at that time, but whether he was questioned about it during the August 31 interview before he invoked his right to remain silent. On this question, most significantly, Warnke testified the officer who conducted the August 31 interview was not involved in the homicide investigation, and appellant cites no evidence to the contrary. Warnke further testified this officer told him appellant had been arrested for an unrelated theft offense on August 31. This is consistent with the officers' statement in the September 2 interview that appellant "got picked up this past Friday" but "we don't really care about" that. The available evidence thus establishes that appellant was not questioned about the Escalon incident on August 31.

Even if the evidence were inconclusive, appellant's suggestion that this issue is dispositive is incorrect. "In *Mosley* the second interrogation related to an entirely different crime . . . . To our mind, the issue does not revolve around the fact the second interview of defendant was not for another separate crime. That is but one factor to be considered in applying the factual test of *Mosley*. . . . [¶] The real issue is whether defendant's *Miranda* right to cut off the questioning was respected in the totality of the circumstances." (*People v. Warner* (1988) 203 Cal.App.3d 1122, 1130–1131; see also *Krebs, supra,* 8 Cal.5th at pp. 315–316 [no *Mosley* violation even though post-invocation interview was about the same crime, reasoning that, "[w]ithout suggesting that all of the above must be present or that any of those factors is sufficient, we conclude that under these circumstances, the trial court did not err in admitting the post-advisement confession [following a prior invocation]"].) Appellant's contention that a suspect must make an express waiver prior to the second interview is also not supported by the caselaw. (See *Mosley, supra,* 423 U.S. at pp. 104–105 ["[The defendant] was

given full and complete *Miranda* warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options."]; *Krebs, supra,* 8 Cal.5th at p. 297 [prior to the post-invocation interrogation, the officer "read defendant his *Miranda* rights, and defendant acknowledged that he understood them"].)

In *Krebs,* the defendant invoked his right to remain silent while being questioned about the disappearance of two victims. (*Krebs, supra,* 8 Cal.5th at pp. 295–296, 312.) The officer continued to question him, but eventually ended the interview; when the officer asked if he could return the following day, the defendant responded " ' "Maybe." ' " (*Id.* at p. 296.) The following morning the officer returned and continued to ask questions about the victims' disappearance. (*Id.* at pp. 296–297.) Eventually, after two additional *Miranda* advisements, the defendant confessed. (*Id.* at p. 297.) The California Supreme Court held the confession admissible: "[The defendant] was given an 18-hour break from interrogation after invoking his right to remain silent; he left open the possibility for the officer to reinitiate contact, and upon being contacted, cooperated with the interrogation. When he confessed, his confessions were preceded by *Miranda* warnings that effectively apprised him of his rights." (*Id.* at p. 316; see also *id.* at pp. 315–316 [the 18-hour break in that case "was substantially longer than the two-hour period in *Mosley* in which the suspect was left alone and the court found questioning could be reinitiated"].)

In *Martinez,* the California Supreme Court held the defendant's *Miranda* rights were not violated after the defendant invoked the right to remain silent, under the following circumstances: "the detectives waited overnight to approach defendant again, and their questioning shifted quickly

21

from Sabrina P.'s assault [the focus of the prior interview] to a different crime, Sophia's murder.  Although the detectives did not reread defendant his *Miranda* rights verbatim, they did remind him of the admonition given the night before and then specifically asked him if he remembered those rights and whether he still wanted to talk.  Defendant responded affirmatively. Given that defendant had been read his *Miranda* rights the night before and on at least four prior occasions, the record fails to support any inference that defendant was unaware of his rights and the significance of his waiver." (*Martinez, supra,* 47 Cal.4th at p. 950.)

Here, police waited two days after appellant invoked his right to remain silent before approaching him—longer than the time in *Mosley, Krebs,* and *Martinez.*  At that time, appellant was readvised of his *Miranda* rights, acknowledged that he understood them, and proceeded to answer the officers' questions.  The evidence indicates the questions were about different offenses than those asked during the August 31 interview.  Considering the totality of the circumstances, we find the officers did not violate appellant's *Miranda* rights by interviewing him on September 2 following his August 31 invocation of his right to remain silent.

B.      *New Invocation of Right to Remain Silent*

Appellant also argues that he invoked his right to remain silent during the September 2 interview.

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously'* assert his right to silence or counsel.  [Citation.]  It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights.  [Citation.]  Faced with an ambiguous or equivocal statement, law enforcement officers are not required under

*Miranda, supra,* 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*).) " 'A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning.' " (*People v. Williams* (2010) 49 Cal.4th 405, 433 (*Williams*).)

Two of the statements appellant relies on took place during an exchange in which the officers probed whether appellant ever went to the Castro neighborhood of San Francisco. They asked whether appellant ever "hook[ed] up with someone there" to "get a place to crash for the night." Appellant vehemently responded no, adding "That's really not me." The officers continued, saying, "people that are down on their luck do things that they--they normally wouldn't do" that are "out of their comfort zone just to make ends meet . . . ." Appellant again responded strongly, "No. I haven't. No way;" "No. Nuh-uh. I'm like, uh--uh-uh. That's just not even me ever, ever, ever, ever." The officers then asked whether, "just to party," he ever "just hook[ed] up with gay guys." Appellant responded, "I feel like, uh, right now, it just--you know what I'm sayin'? *I'm uncomfortable right now. Just talkin' about it.* Let alone somebody--some other guy, whatever. It's like, uh-uh." (Italics added.)

The officers continued, "How about as a ruse, like, say, you know not saying that you did, but saying you wanted to swipe something from someone, would you be the type of person that would say, play along," "to kind of play along like, yeah, yeah, yeah. You know, I'm into that. Let's go back to your house and then if you see something kind of snatch it and boom, out the door." Appellant responded, "Hell, no. What would everybody else

think?  You crazy?  Yeah, then, you know, you're with a girl and the next thing you know you've got other guys coming up to you and like, what the hell?  Nuh-uh.  No.  Uh-uh.  *I don't want to answer that kind of weird shit*." (Italics added.)

In context, a reasonable officer could understand the italicized statements as an expression of appellant's discomfort with being identified as or perceived to be gay rather than a blanket statement that appellant did not want to talk about the Escalon investigation.[20]  (See *Williams, supra,* 49 Cal.4th at p. 434 ["In our view, the statement italicized above—'I don't want to talk about it'—was an expression of defendant's frustration with [the officer's] failure to accept defendant's repeated insistence that he was not acquainted with the victim as proof that he had not encountered her on the night of the crime, rather than an unambiguous invocation of the right to remain silent.  [Citations.]  A reasonable officer could interpret defendant's statement as comprising part of his denial of any knowledge concerning the crime or the victim, rather than an effort to terminate the interrogation."].)  Appellant's reliance on *People v. Case* (2018) 5 Cal.5th 1 is therefore inapposite.  (*Id.* at pp. 17, 21 [the defendant's statement, when asked if he would talk to officers, " 'No, not about a robbery/murder.  Jesus Christ,' " was an unambiguous invocation, and was not solely a partial invocation because "[t]he robbery murder was the only subject under discussion"].)

Appellant also relies on his statement, after the officers told him Escalon was dead, appellant's DNA was found on a knife in the apartment, and the cab driver identified appellant, that, "*I shouldn't talk to you people,*

---

[20] Warnke testified he understood the statements to mean appellant "didn't want to acknowledge being the type of person who would hang out with the gay crowd."

24

*though*," adding "*That's why you read the Miranda [r]ights, you say all this shit in court . . . .*" (Italics added.)  Similarly equivocal statements have been held to not constitute an invocation of the right to remain silent.  For example, in *People v. Bacon* (2010) 50 Cal.4th 1082, the defendant told police, " 'I think it'd probably be a good idea for me to get an attorney.' " (*Id.* at p. 1105.)  The California Supreme Court held, "Because defendant's statement contains several ambiguous qualifying words ('I think,' 'probably,' and 'it'd'), we do not consider defendant's statement to be sufficiently clear in and of itself." (*Ibid.*; see also *Stitely, supra,* 35 Cal.4th at p. 535 ["A reasonable officer in Detective Coffey's position would have concluded that defendant's first remark ('I think it's about time for me to stop talking') expressed apparent frustration, but did not end the interview."].)  Appellant's statement was similarly equivocal, ambiguously providing that he "shouldn't" talk to police.  (Cf. *People v. Henderson* (2020) 9 Cal.5th 1013, 1023 [" '[I] want to, speak to an attorney first' " was unequivocal invocation].)

In sum, the trial court did not err in rejecting appellant's *Miranda* claims.

IV.    *Coercion*

Appellant argues his statements to police were involuntary because the officers engaged in coercive tactics.  The evidence at the pretrial hearing on this issue was the complete video of the interview, Warnke's testimony, and the testimony of a defense expert in police interrogation and involuntary admissions.  Appellant alternatively argues the trial court erred in precluding the admission of some of this evidence at trial.  We find appellant's statements were not involuntary and any evidentiary error was harmless.

25

A. *Involuntariness*

"Both the federal and state Constitutions bar prosecutors from introducing into evidence a defendant's involuntary statement to government officials. [Citation.] This prohibition bars the admission of an involuntary confession, as well as an involuntary admission. [Citation.] In determining whether a statement is involuntary, 'we consider the totality of the circumstances to see if a defendant's choice to confess was not " ' " 'essentially free' " ' " because his will was overborne by the coercive practices of his interrogator.' [Citation.] Coercive police conduct includes physical violence, threats, direct or implied promises, or any other exertion of improper influence by officers to extract a statement. [Citation.] The presence of coercion is a necessary, but not always sufficient, predicate to finding a confession was involuntary. [Citation.] We also consider other surrounding circumstances apparent from the record, including both the details of the interrogation and the characteristics of the accused." (*People v. Battle* (2021) 11 Cal.5th 749, 790 (*Battle*).)

"When a defendant challenges the admission of a statement on the grounds that it was involuntarily made, the state bears the burden of showing by a preponderance of the evidence that a defendant's statement was, in fact, voluntary. [Citation.] On appeal, we accept the trial court's factual findings as to the circumstances surrounding the confession, provided they are supported by substantial evidence, but we review de novo the ultimate legal question of voluntariness." (*Battle, supra,* 11 Cal.5th at p. 790.)

We begin by noting "various indicia of voluntariness that [appellant] doesn't dispute": there is "no allegation that he suffered any physical abuse," "[t]here were breaks during the interview and [appellant] was given water"

26

and food.  (*Battle, supra,* 11 Cal.5th at p. 791.)  In addition, appellant was a mature adult in his 40s with a criminal record at the time of his interrogation, and therefore was not " 'unskilled and uncounseled in the law.' "  (*People v. Cahill* (1994) 22 Cal.App.4th 296, 317 (*Cahill*); cf. *ibid.* ["defendant was a youth raised in other states, who had just attained his majority, and whose education extended only to the eighth grade"].)  Throughout the interrogation appellant consistently denied intending to steal from Escalon when they went to Escalon's apartment, binding him in order to steal from him, or intending to do him any physical harm, indicating that appellant's will was not overcome.  (See *Battle, supra,* 11 Cal.5th at p. 792 [the defendant's "admission also potentially reflects a desire to cooperate for the purposes of exculpating himself" by "continu[ing] to tell a version of events that minimized his involvement," supporting a conclusion that the defendant's will was not overcome].)  "These circumstances of the interview and the accused buttress the trial court's conclusion that [appellant's] statements to [police] were voluntary."  (*Battle,* at p. 791.)

Appellant's arguments do not persuade us otherwise.  Appellant makes passing reference to the length of the interrogation: six hours, including four breaks.  Appellant points to testimony of his defense expert that 95 percent of interrogations are less than two hours, but the expert also testified he did not know the typical length of a *homicide* interrogation.  In any event, the length of an interrogation alone does not render it coercive.  (See *People v. Carrington* (2009) 47 Cal.4th 145, 175 (*Carrington*) ["In the present case, although the questioning continued over the course of eight hours, it does not appear that defendant's will to resist was overborne."]; *People v. Peoples* (2016) 62 Cal.4th 718, 739, 741 [interrogation lasting more than 12 hours not coercive "under the ' "totality of the circumstances" ' "].)

27

Appellant points to the officers' promises to help appellant get into a residential drug program. Early in the interview, the officers told appellant, "I don't know if I can get--if I can get you into a program? I can definitely look into it, though. And find resources;" "I can definitely try to facilitate that for you. If that's something you're interested in. I can help you out with that;" "I'm gonna try to get you--you want to get into a program." These statements were not coercive. The officers did not condition their assistance on appellant's confession. Moreover, the statements occurred long before appellant's admissions, and therefore any conceivable coercive effect is not causally connected. (See *Battle, supra,* 11 Cal.5th at pp. 794–795 [police statement "had no proximate causal connection to [the defendant's] subsequent admission" because "[i]mmediately after [the challenged statement] . . . , [the defendant] did not change the story he was then telling"].)

Appellant also relies on the officers' delay in letting him smoke cigarettes, despite his repeated requests. But many of these delays took place well before appellant's admission, and appellant had cigarette breaks *before* his admission, indicating no causal connection between any delay in providing cigarette breaks and his admission. Appellant references the provision of food and drink, but the officers offered and promptly provided appellant with food and drink.

Finally, appellant contends the officers threatened harsher treatment if appellant did not cooperate. After telling appellant about his DNA in the apartment and the cab driver's identification, the officers told him, "You know what went down. I don't think you necessarily know the aftermath of--of what--of course--what happened afterwards. It's pretty evident to me that that's a very real possibility. You know? But us not knowing what

28

happened, the only thing we have to speculate is your intention was to go there to kill him and rip--and rip off," which is "pre-meditation." The officers continued, "there's a difference between plannin' on doin' something or doing things in the heat of passion, or--or--you know what I mean? Or as an after-thought or, you know, sometimes--it wasn't even your intention." Shortly thereafter, they said, "Just tell us what happened, dude. The--there is a huge difference of going there for one thing and--then meeting this happen, it's--it's--and there is a big difference. And you asked what's does--what's the difference? There's a huge difference. Help us help you. Help us go to the DA" and say "this is what happened. He told us what happened. He was honest about what happened."

Appellant argues that, because premeditated murder and felony murder are both first degree murder, there is not in fact a difference between the two, and the police therefore falsely told appellant he would receive more lenient treatment if he confessed. Appellant relies on *Cahill, supra,* in which the officer investigating a burglary-murder gave the defendant a detailed summary of the law of homicide that was "materially misleading in omitting any reference to the felony-murder doctrine." (*Cahill, supra,* 22 Cal.App.4th at pp. 306–307, 315.) The officer also told the defendant, " 'if there's mitigating circumstances and if you were caught in there, that changes the whole thing. That's gonna—that's gonna have an affect on how much time you do.' " (*Id.* at p. 307.) The Court of Appeal held the statements improperly constituted "an implied promise that if the defendant did admit a role in the killing but had not premeditated he might avoid trial and conviction of first degree murder." (*Id.* at p. 314.)

This case is distinguishable from *Cahill.* Instead, it is more akin to *People v. Holloway* (2004) 33 Cal.4th 96, another burglary-murder case, in

which the Supreme Court held the officers' "suggestions that the killings might have been accidental or resulted from an uncontrollable fit of rage during a drunken blackout, and that such circumstances could 'make[ ] a lot of difference,' fall far short of being promises of lenient treatment in exchange for cooperation. The detectives did not represent that they, the prosecutor or the court would grant defendant any particular benefit if he told them how the killings happened." (*Id.* at p. 116.) *Holloway* specifically distinguished *Cahill* because unlike that case, "[n]o specific benefit in terms of lesser charges was promised or even discussed, and [the officer's] general assertion that the circumstances of a killing could 'make[ ] a lot of difference' to the punishment, while perhaps optimistic, was not materially deceptive." (*Holloway,* at p. 117.) Similarly, in *Carrington, supra,* the officer told the defendant "that he wanted to present a package to the district attorney in which he would be able to say 'that in all cases that you have been charged with, all the cases you've been involved with, that you helped and assisted the police in their investigation.' " (*Carrington, supra,* 47 Cal.4th at p. 173.) The Supreme Court rejected the argument that this constituted a promise of leniency, finding "[t]he interviewing officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way." (*Id.* at p. 174.) As in *Holloway* and *Carrington,* the officers' statements to appellant that cooperation could be beneficial in an unspecified way was not coercive.

In sum, considering the totality of the circumstances, we find appellant's will was not overcome in the interrogation.

B.   *Admissibility of Evidence at Trial*

Appellant argues in the alternative that the trial court erred in excluding evidence of coercion at trial: excluded portions of the interview, testimony of the defense expert, and cross-examination of Warnke on the issue.  (See *People v. Page* (1991) 2 Cal.App.4th 161, 185 ["[A] finding that the confession is voluntary does not render such evidence irrelevant or inadmissible.  Rather, 'evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess.' "].)  Appellant also challenges the trial court's refusal to instruct the jury that they may consider "the physical and psychological environment that yielded the defendant's statements in determining whether they are believable."  We find any error harmless as to the remaining convictions of the burglary of Hohn's room and theft, and as to involuntary manslaughter if the People accept the reduction on remand.

First, as discussed above, the evidence of coercive tactics was minimal at best.  To the extent there was evidence of coercion, appellant argues his expert testified at the pretrial hearing that coercive tactics generally increase the risk of unreliability, but the expert also testified coercion does not necessarily mean an admission is unreliable.

Second, at trial the defense relied on many of appellant's statements to the police, and on appeal appellant fails to identify why the jury would have found specific statements unreliable but for the asserted error.  For example, appellant refers to his statement that Escalon was alive when appellant left the apartment.[21]  But appellant fails to explain why, absent the assumed error, the jury could have found *this statement* unreliable but still believed

---

[21] Defense counsel argued at trial that if Escalon was no longer alive at the time appellant committed the felony, it was not felony murder.

31

other statements relied on by the defense, such as that appellant did not initially intend to steal from Escalon.

In sum, any error in excluding evidence about the conditions surrounding appellant's admission and in refusing the requested jury instruction was harmless under any standard.

V.      *Evidence of Escalon's Interest or Lack of Interest in Sexual Submission*

Appellant argues the trial court erred in admitting evidence that Escalon did not have an interest in being sexually submissive and that his binding was not consistent with consensual bondage,[22] and/or in excluding evidence that Escalon *did* have an interest in being sexually submissive. We find any error harmless.

As an initial matter, we reject appellant's contention that any of the asserted errors were violations of federal constitutional rights. Appellant's right to confront and cross-examine witnesses was not violated by the trial court's rulings limiting the scope of his cross-examination. (*People v. Carter* (2005) 36 Cal.4th 1114, 1172 ["the federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer"].) Appellant was allowed to present some evidence of Escalon's interest in being sexually submissive, and therefore was not deprived of a meaningful opportunity to present a complete defense.[23] (*People v. Bacon, supra,* 50 Cal.4th at p. 1104, fn. 4 ["only

_____

[22] Appellant also argues prosecutorial error by the presentation of this evidence.

[23] For example, Hohn testified Escalon was "obsessed with being a bottom;" an online communication from Escalon saying he would "be blindfolded" and "have porn and poppers ready" was admitted; photographs of Escalon wearing a blindfold and posing with a man holding a whip were

32

evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense"].)  In short, "[w]e reject defendant's attempt 'to inflate garden-variety evidentiary questions into constitutional ones.' " (*Ibid.*)  Instead, we review under the state law prejudice standard, which "inquires whether 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Valencia, supra,* 11 Cal.5th at p. 840.)

As appellant argues, the challenged errors were relevant to the issue of whether Escalon consented to being bound by appellant.  With respect to an involuntary manslaughter conviction that the People may accept on remand, a conviction would not depend on Escalon's lack of consent to being bound. As to appellant's convictions for theft and for burglary of Hohn's bedroom, appellant does not contend the asserted errors were prejudicial, apart from a generalized argument that they impacted the jury's assessment of appellant's credibility.  But the jury credited appellant's statement that he did not intend to steal from Escalon when he entered the apartment, as evidenced by the not guilty verdict on the count of burglary of Escalon's bedroom.  And, given the additional overwhelming evidence supporting the theft offenses, any impact on the jury's credibility assessment was not reasonably likely to change the outcome on these counts.

VI.    *Claim-of-Right Defense*

Appellant argues the trial court erred in failing to sua sponte instruct the jury on the claim-of-right defense.  " 'The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent

---

admitted; and the trial court ruled any witness with personal knowledge of Escalon's sexual preferences could testify.

necessary for conviction of theft or robbery.' [Citation.] A trial court, however, is not required to instruct on the defense ' "unless there is evidence to support an inference that [the defendant] acted with a subjective belief he or she had a lawful claim on the property." ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 872 (*Covarrubias*).) "The good faith belief in a claim of right . . . must relate to specific property." (*Id.* at p. 874.)

Appellant concedes there was no evidence he had a good faith claim of right in the property he took from Escalon and Hohn. Instead, he argues the claim-of-right defense was relevant to the *timing* of his intent to commit theft. Burglary is committed when a person "enters any house, room, apartment, . . . or other building . . . with intent to commit grand or petit larceny or any felony . . . ." (§ 459.) "In order to constitute burglary, the defendant must intend to commit the theft or felony at the time of entry." (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540.)[24] Appellant points to evidence that Escalon agreed to pay appellant for nude photographs, gave appellant $100, but then took the cash back from appellant. Appellant argues that if he intended to take the cash Escalon previously gave him at the time he entered Hohn's bedroom, and only decided to take other property afterwards, he was guilty of theft rather than burglary.

We assume without deciding the claim-of-right defense can be so applied, and reject the argument. First, appellant did not request the claim-of-right instruction below. "[B]ecause the asserted claim of right served only to negate the intent to steal element of the robbery [or burglary] charges and the trial court otherwise properly instructed the jury on this element, it was

---

[24] Because we are reversing the robbery conviction on other grounds (*ante,* part II), we address this issue solely as to the burglary conviction.

not required to instruct on the defense in the absence of a request by trial counsel." (*Covarrubias, supra,* 1 Cal.5th at p. 874.)[25]

Second, appellant has not established trial counsel was ineffective in failing to request the instruction. (See *People v. Zaheer* (2020) 54 Cal.App.5th 326, 335 ["To prevail in a claim of ineffective assistance of counsel, the appellant must first demonstrate that the defense attorney's performance was deficient—meaning it 'fell below an objective standard of reasonableness' under 'prevailing professional norms'—and then show prejudice resulted."].) Even assuming counsel's performance was deficient, appellant cannot establish prejudice. There is no evidence appellant reasonably thought the cash Escalon previously gave him would be in Hohn's bedroom.[26] Even if substantial evidence supported a claim-of-right instruction as to this count, it is not reasonably probable the outcome would have been more favorable to appellant with such an instruction. Accordingly, appellant has failed to establish error or ineffective assistance of counsel with respect to the claim-of-right instruction.

---

[25] Appellant's suggestion that a subsequent Supreme Court decision calls this aspect of *Covarrubias* into question is unavailing. Appellant points to *People v. Powell* (2018) 6 Cal.5th 136, 164, which held, "A trial court is required to instruct sua sponte on a duress defense if there is substantial evidence of the defense and if it is not inconsistent with the defendant's theory of the case." This is not inconsistent with *Covarrubias,* which explained, " ' " 'when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking sua sponte instructional duties.' " ' " (*Covarrubias, supra,* 1 Cal.5th at p. 873, italics omitted; see also *id.* at p. 874 ["the asserted claim of right served only to negate the intent to steal element of the robbery charges"].)

[26] Appellant points to his statement to police that he "looked for the money." But there is no indication he looked for it anywhere outside of Escalon's bedroom.

VII. *Expectation of Privacy*

Appellant argues the trial court erred in refusing to instruct the jury it must find a reasonable expectation of protection from intrusion as to Hohn's bedroom in order to convict appellant of a second count of burglary.

"Where a burglar enters a structure enumerated under section 459 with the requisite felonious intent, and then subsequently enters a room within that structure with such intent, the burglar may be charged with multiple burglaries only if the subsequently entered room provides a separate and objectively reasonable expectation of protection from intrusion relative to the larger structure." (*People v. Garcia* (2016) 62 Cal.4th 1116, 1119–1120 (*Garcia*).)

Appellant was charged with separate counts of burglary for Escalon's bedroom and Hohn's bedroom. Appellant requested the jury be instructed, as to the burglary of Hohn's bedroom, that it must find Hohn had a reasonable expectation of privacy and security in his bedroom. The trial court rejected the request on the ground that the matter was "a legal issue that the Court's already decided." We agree with appellant that the question is a factual one for the jury to decide. (See *Garcia, supra,* 62 Cal.4th at pp. 1132–1133 [issue was whether "a fact finder could consider the [internal room] to provide a heightened expectation of privacy and security beyond what the [structure] itself provided;" review was for "substantial evidence"].)

However, in light of the jury verdict, the error is harmless under any standard. The jury found appellant not guilty of the burglary of Escalon's bedroom; in other words, it did not find that appellant formed the intent to commit theft before he entered the apartment. *Garcia* held the burglary statute "does not necessarily suggest that a room must be separately possessed or secured to be burgled" and expressly "cast no doubt on the many

36

Court of Appeal decisions upholding burglaries of rooms that do not fit this definition when the defendant entered the enclosing structure without felonious intent." (*Garcia, supra,* 62 Cal.4th at p. 1124.) Because *Garcia* does not prohibit the jury from convicting appellant of a single count of burglary of Hohn's bedroom regardless of whether Hohn had a reasonable expectation of privacy and security in his bedroom, the instructional error was harmless.[27]

## DISPOSITION

Appellant's murder conviction is reversed, although the People may accept a reduction of the conviction to involuntary manslaughter. Appellant's conviction of robbery is reversed, although the People may accept a reduction of the conviction to petty theft. If, after the filing of the remittitur in the trial court, the People do not bring appellant to retrial on murder and robbery within the time set forth in Section 1382, subdivision (a)(2)—60 days unless waived by appellant—the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of involuntary manslaughter and petty theft and shall resentence appellant accordingly. The trial court's judgment is otherwise affirmed.

SIMONS, Acting P. J.

WE CONCUR:
BURNS, J.
CHOU, J.

(A163456)

---

[27] Appellant argues he was cumulatively prejudiced by trial errors. As to the convictions we are not reversing, we have found all errors or assumed errors harmless. Considered together, the errors and assumed errors are still harmless. (See *People v. Cain* (1995) 10 Cal.4th 1, 82 ["Defendant was entitled to a fair trial, not a perfect one."].)

37